# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | 8:15CR217 |
| Plaintiff, | ) | |
| | ) | FINDINGS AND |
| v. | ) | RECOMMENDATION |
| | ) | |
| JOSUE QUIROGA and | ) | |
| HAMOLEQUET ADI QUIROGA, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the motions to suppress filed by defendants Josue Quiroga (Filing No. 27) and Hamolequet Quiroga (Filing No. 25). The Quirogas are both charged in the Indictment with a conspiracy to distribute and possess with intent to distribute methamphetamine (Count I) in violation of 21 U.S.C. § 846. Josue Quiroga is additionally charged with the possession of various firearms in furtherance of a drug trafficking crime (Count II) in violation of 18 U.S.C. § 924(c)(1)(A). The Indictment also charges both Quirogas with a Forfeiture Allegation seeking the forfeiture of $14,520.00 and any other property used to commit the offense alleged in Count I of the Indictment. The Quirogas seek to suppress evidence seized by law enforcement officers of the Nebraska State Patrol (NSP) following a traffic stop on westbound Interstate 80 in Nebraska on the morning of February 8, 2015, along with any statements the Quirogas may have given to the officers that day.

The court held an evidentiary hearing on October 16, 2015. Josue Quiroga was present with his counsel, Assistant Federal Public Defender Richard H. McWilliams. Hamolequet Quiroga, also present, was represented by Jessica P. Douglas. The United States was represented by Special Assistant U.S. Attorney Martin R. Klein and Assistant U.S. Attorney Thomas J. Kangior. No interpreter was requested or used during the hearing. The court heard the testimony of Troopers Ryan Henrichs (Trooper Henrichs) and Dain Hicks (Trooper Hicks). The court also received into evidence copies of the troopers' in-car audio/videotape (Exhibits 1 and 2) and NSP Record (Exhibit 101). The defendants requested and were granted the opportunity to file post-hearing briefs following the filing of a transcript. A transcript (TR.) of the hearing was prepared and filed on November 3,

2015 (Filing No. 42). Josue Quiroga filed a post-hearing brief on November 16, 2015 (Filing No. 48). Hamolequet Quiroga filed a post-hearing brief on November 14, 2015 (Filing No. 47). The government filed its post-hearing brief on November 30, 2015 (Filing No. 49).

## FINDINGS OF FACT

Trooper Henrichs was on duty in uniform and in his patrol car in the early morning hours of February 8, 2015 (TR. 6). While sitting in his patrol car in the median at the western outskirts of Lincoln, Nebraska, on Interstate 80 watching traffic, he observed a vehicle traveling westbound which appeared to be exceeding the posted speed limit of 55 miles per hour in a construction zone (TR. 6-7). Trooper Henrichs then used his radar unit and clocked the vehicle traveling at sixty-eight miles per hour (TR. 8). Trooper Henrichs conducted a second radar check which indicated the vehicle had slowed to sixty-six miles per hour (TR. 8). Trooper Henrichs testified he calibrated his radar unit before starting his shift that day, and the radar unit was in proper working order (TR. 9). Trooper Henrichs gave chase to the vehicle which pulled over to the side of the Interstate at mile marker 395 (TR. 10). Trooper Henrichs' patrol car was equipped with an audio-video camera and the audio/video of the encounter is depicted on Exhibit 1 (TR. 11).

The vehicle stopped was a Ford pickup truck with a driver and a passenger (TR. 11). Trooper Henrichs got out of his patrol car and approached the pickup truck on the passenger side and conversed with the occupants through the passenger side window (TR. 11). Trooper Henrichs identified the driver as the defendant Josue Quiroga and the passenger as defendant Hamolequet Adi Quiroga (TR. 11-13). Trooper Henrichs informed the occupants of the reason for the stop and asked for identification and paperwork for the pickup (TR. 13). After searching around for the registration, they produced a registration of the pickup in the name of Maria Montanez (TR. 14). The driver, Josue Quiroga, informed Trooper Henrichs he did not have his driver's license on him (TR. 14). While at the passenger side window of the pickup, Trooper Henrichs noted: 1) an odor of oranges coming from the pickup; 2) three cell phones in the pickup; and 3) a plastic ammo can sitting on the back floor of the pickup cab (TR. 14). Trooper Henrichs directed the driver

2

to get out of the pickup and come back to Trooper Henrichs' patrol car (TR. 15). Josue Quiroga walked back to the patrol car and sat in the front passenger seat while Trooper Henrichs was seated in the driver's seat (TR. 15).

Trooper Henrichs began filling out a warning ticket and engaged Josue Quiroga in conversation (TR. 15). Trooper Henrichs asked Josue Quiroga where he was coming from (TR. 15). Josue Quiroga responded "What?" (TR. 15). Trooper Henrichs again asked Josue Quiroga where he was coming from and Josue Quiroga responded he was coming from Omaha (TR. 15). Trooper Henrichs asked where Josue Quiroga lived and Josue Quiroga stated he lived in Kearney, Nebraska (TR. 16). The first time Trooper Henrichs asked Josue Quiroga his name, Josue Quiroga responded "Jeremias Tores" (TR. 16). Using that information Trooper Henrichs used his in-patrol car laptop computer and queried the Lincoln Police Department's local page and then queried the Nebraska Criminal Justice Information System (NCJIS) (TR. 16). Trooper Henrichs was unable to find anything on Jeremias Tores (T-o-r-e-s) (TR. 16-17). When asked who the passenger was, Josue Quiroga stated the passenger was his sister (TR. 17). When asked what they were doing in Omaha, Josue Quiroga stated they were shopping (TR. 17). When asked where they were shopping at two o'clock in the morning, Josue Quiroga stated they had been shopping and then went out to eat at a Buffalo Wild Wings (TR. 17-18).

Unable to identify Josue Quiroga, Trooper Henrichs asked Josue Quiroga if Trooper Henrichs could see his wallet but Josue Quiroga did not produce a wallet (TR. 18). Trooper Henrichs again asked Josue Quiroga if he could see his wallet (TR. 18). Josue Quiroga then told Trooper Henrichs his name was Jeremias Torres (T-o-r-r-e-s) and produced a wallet (TR. 18). Trooper Henrichs again queried the local and NCJIS systems and found no information (TR. 18). Trooper Henrichs observed no identification in the wallet but noticed a separate pocket in the wallet with a large amount of U.S. currency (TR. 19-20). When asked what his job was and when he last worked, Josue Quiroga stated he was a construction worker and his last job was a week ago (TR. 27). While Josue Quiroga was in the patrol car, Trooper Henrichs noted the following with regard to Josue Quiroga: 1) he pulled up his hood when he entered the patrol car; 2) he abnormally stared ahead or out the passenger window while Trooper Henrichs was talking with him; 3) he "popped" open

3

the passenger side door a couple of times and Trooper Henrichs twice asked him to close the door; 4) his hands were not typical of a construction worker he claimed to be; 5) he had a high level of nervousness; 6) he breathed heavily; 7) his carotid artery pulsated; 8) and he "farted" quite often while in the patrol car (TR. 30-37).

Trooper Henrichs recontacted the passenger, Hamolequet Adi Quiroga, at the passenger side window of the pickup (TR. 22). When asked what the driver's name was, she said Jeremiah Tamaro and that he was her cousin (TR. 22-23). Asked where she was coming from, she stated Iowa, that she was visiting friends for a couple of days and she lived in Kearney, Nebraska (TR. 24). She said the driver lived in California and was staying with her (TR. 25). When asked she did not know how long he had been in Nebraska as she had been in Des Moines for a week (TR. 25).

Trooper Henrichs returned to the patrol car and computer checked Hamolequet Adi Quiroga's driver's license and the vehicle (TR. 27). Her license was valid and the vehicle was registered, had insurance and was not reported stolen (TR. 27). Trooper Henrichs gave the vehicle paperwork and a warning citation to Josue Quiroga and informed him the stop was over (TR. 30). Trooper Henrichs asked Josue Quiroga to stay in the car and again went to the pickup to talk with the passenger (TR. 30). Standing at the passenger side of the pickup, Trooper Henrichs returned Hamolequet's driver's license to her and informed her the stop was over (TR. 31). He again asked her questions about their trip, but her answers were inconsistent with her previous answers and inconsistent with the driver's answers (TR. 32). As Trooper Henrichs was talking with the passenger, Josue Quiroga got out of the patrol car (TR. 32-33). Trooper Henrichs ordered Josue Quiroga back in the patrol car and walked back to and entered the patrol car (TR. 33).

When Trooper Henrichs got back into the patrol car, he continued to ask Josue Quiroga questions about his trip to clarify the situation (TR. 37). Trooper Henrichs handed the warning citation to Josue Quiroga at 2:41:57 hours (Ex. 1; TR. 86). Receiving no clarification except Josue Quiroga stated Hamolequet was probably scared because Josue was illegal, Trooper Henrichs asked Josue Quiroga for permission to search the pickup (TR. 37; Ex. 1). Josue Quiroga stated he didn't think he could give permission since the pickup did not belong to him (TR. 38). When Trooper Henrichs explained to Josue Quiroga

4

that he could give permission, Josue Quiroga stated, "no" (TR. 38). When asked if he would be willing to wait for a K-9 to come and sniff the exterior of the pickup, Josue Quiroga stated he would rather get going (TR. 38). Trooper Henrichs then called for a K-9 unit to come to the roadside scene at 2:57:21 hours (Ex. 1; TR. 40, 86).

The nearest K-9 unit for the NSP was located about fifteen miles away in Lincoln, Nebraska (TR. 102). Trooper Hicks at home, asleep, was awakened by a call from dispatch that he was wanted for a denied consent at an Interstate roadside stop (TR. 102). Trooper Hicks got dressed and obtained his service dog, J.D., from his kennel, and drove without delay to the location of the Interstate roadside stop of the pickup about twenty minutes after receiving the call at 3:36:54 (TR. 102-105; Ex. 1 and 2). Trooper Hicks' patrol car was also equipped with a video recorder (TR. 110; Ex. 2). Upon arrival, Trooper Hicks parked behind Trooper Henrichs' patrol car, got out of his patrol car, and talked briefly with Trooper Henrichs (TR. 105). Trooper Hicks then conducted a walk around of the pickup before deploying J.D. (TR. 105). Trooper Hicks then retrieved J.D. from his patrol car and had J.D. conduct a counterclockwise sniff of the pickup starting at the rear of the pickup (TR. 106). On the first lap around the pickup, J.D. alerted to the passenger side door of the pickup (TR. 107). J.D. again alerted to the passenger side door on the second lap (TR. 107). On the third lap, J.D. again alerted to the passenger side door and then went into an indication, i.e., briefly stood and then started to slowly sit (TR. 107-108). Trooper Hicks returned J.D. to Trooper Hicks' patrol vehicle and advised Trooper Henrichs he had probable cause to search the vehicle (TR. 108).

Trooper Hicks has been a K-9 handler since 2013 (TR. 90). Trooper Hicks obtained J.D., a Belgian Malinois dog, in 2014 (TR. 100). Trooper Hicks testified as to the training and certification of a police dog and his handler (TR. 91-99). At the time of the roadside sniff of the pickup in February 2015, Trooper Hicks and J.D. were certified as a police dog team under NSP guidelines (TR. 100, 111). J.D.'s service record as a drug detection dog was introduced into evidence and explained by Trooper Hicks (Ex. 101; TR. 116-120).

Following Trooper Hicks statement of J.D.'s indication, Trooper Henrichs searched the pickup while Trooper Hicks watched Josue and Hamolequet Quiroga (TR. 46, 108). Trooper Henrichs found five guns, a black bulletproof vest, an ammo can, a black ski mask,

5

brass knuckles, two bags of marijuana, and a safe behind the driver's seat that contained a handgun, cocaine, methamphetamine, pills believed to be ecstasy, and a bundle of U.S. currency (TR. 47-48).

## LEGAL ANALYSIS

### A. Traffic Stop

A law enforcement officer's observation of a traffic violation provides probable cause to stop a vehicle. **United States v. Gunnell**, 775 F.3d 1079, 1083 (8th Cir. 2015). An officer's subjective motivations do not affect the reasonableness of a traffic stop based on the violation of the traffic laws. **Id.** Moreover, the stop is valid even if the police would have ignored the traffic violation but for the suspicion that greater crimes were afoot. **United States v. Frasher**, 632 F.3d 450, 453 (8th Cir. 2011).

Contemporaneous with a valid traffic stop, the officer may "conduct an investigation reasonably related in scope to the circumstances that justified the stop." **United States v. Anguiano**, 795 F.3d 873, 876 (8th Cir. 2015). In fact, a police officer may detain the occupants while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. **Id.**; **see also United States v. Sokolow**, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the driver and other occupant's destination, purpose of the trip and whether the police officer may search the vehicle. **Id.**; **United States v. Mendoza**, 677 F.3d 822, 828 (8th Cir. 2012).

"If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." **United States v. Ward**, 484 F.3d 1059, 1061 (8th Cir. 2007) (**quoting United States v. Johnson**, 58 F.3d 356, 357 (8th Cir. 1995)). Specifically, an officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made by the police officer regarding illegal drug use, and divergent information from the passengers. **United States v. Bracamontes**, 614 F.3d 813, 816 (8th Cir. 2010); **see also United States v. Lyons**, 486 F.3d 367, 371-72 (8th Cir. 2007); **United States v. $404,905.00 in U.S. Currency**, 182 F.3d 643, 647 (8th Cir.

1999).  In any event, the scope and length of any investigation must be reasonable. *Mendoza*, 677 F.3d at 828.  "[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  **United States v. Chavez Loya**, 528 F.3d 546, 553 (8th Cir. 2008); **see also El-Ghazzawy v. Berthiaume**, 636 F.3d 452, 459 (8th Cir. 2011).  "A constitutionally permissible traffic stop can become unlawful, . . . if it is prolonged beyond the time reasonably required to complete its purpose."  **United States v. Coleman**, 700 F.3d 329, 335 (8th Cir. 2012) (alteration in original) (internal citation omitted).

In this case, Trooper Henrichs observed and radar clocked a speeding violation.  As such, he had probable cause to conduct a traffic stop, which he did.  The defendants and the pickup were detained pending Trooper Henrichs' completion of the traffic stop.  In this case, the driver had no driver's license, the vehicle was registered to a person absent from the scene, the driver provided several variations of a name that did not even belong to him, the passenger gave a different name from what the driver gave, and both the driver and the passenger gave conflicting versions of their itinerary and relationship. Time was required for Trooper Henrichs' attempts to sort out the numerous discrepancies and to identify the driver.  In any event, the traffic stop ended when Trooper Henrichs handed the citation to Josue Quiroga and told him the stop was over.  Prior to that time, I find Trooper Henrichs conducted a reasonable investigation under the auspices of **Sokolow**.  Thereafter, the defendants were detained apart from any traffic stop.

## B. Detention After the Traffic Stop

In **Rodriguez v. United States**, 135 S. Ct. 1614 (2015) (**Rodriguez I**), the United States Supreme Court held that police may not extend an otherwise completed traffic stop absent reasonable suspicion, even for a *de minimus* time, in order to conduct a canine sniff. In **United States v. Rodriguez**, 799 F.3d 1222 (8th Cir. 2015), the Eighth Circuit held **Rodriguez I** did not have retroactive effect in a case where law enforcement officers had an objective reasonable reliance on binding appellate precedent.  In that case there was a *de minimus* intrusion of the defendant's Fourth Amendment rights in walking the drug dog around the stopped vehicle and there was Eighth Circuit precedent holding a *de minimus*

intrusion did not constitute a constitutional violation requiring the invocation of the exclusionary rule. However, in the instant case, Trooper Henrichs took additional time to question the passenger and await a K-9 after he informed both the driver and the passenger that the traffic stop had ended. This was not a *de minimus* intrusion. It was, however, a detention for which Trooper Henrichs had a reasonable articulable suspicion of criminal activity.

An investigative detention, a seizure of limited scope and duration within the meaning of the Fourth Amendment, must be supported by a reasonable articulable suspicion of criminal activity. ***Terry v. Ohio***, 392 U.S. 1, 25-31 (1968). **See, e.g.,** ***Sokolow***, 490 U.S. at 7-10; ***United States v. Green***, 691 F.3d 960, 963 (8th Cir. 2012); ***United States v. Saenz***, 474 F.3d 1132 (8th Cir. 2006). "In making reasonable-suspicion determinations, reviewing courts must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." ***United States v. Martinez-Cortes***, 566 F.3d 767, 769 (8th Cir. 2009) (internal quotation and citation omitted). "Reasonable suspicion must be supported by 'specific and articulable facts.'" ***United States v. Hughes***, 517 F.3d 1013, 1016 (8th Cir. 2008) (***citing Terry***, 392 U.S. at 21). "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed in its totality." ***United States v. Morgan***, 270 F.3d 625, 631 (8th Cir. 2001); **see** *also United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008). When evaluating "each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing" the court "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" ***United States v. Arvizu***, 534 U.S. 266, 273-74 (2002) (**quoting** ***United States v. Cortez***, 449 U.S. 411, 417-18 (1981)); **see also** ***United States v. Stewart***, 631 F.3d 453, 457 (8th Cir. 2011).

Officer Henrichs was aware of the following: 1) three different names given for the driver, two from him and one from the passenger, and the inability through record checks

to verify any one of the names provided; 2) his initial observation of an ammo can in the back seat when he approached the vehicle; 3) a strong smell of oranges (a masking device) when he approached the vehicle; 4) the driver's unusual demeanor while in the patrol car; 5) the discrepancy between the driver and passenger as to the driver's residence; 6) the discrepancy between the driver and the passenger as to their relationship, sister versus cousin; 7) the discrepancy between the driver and passenger regarding where they were coming from, Omaha or Des Moines; 8) the discrepancy between the driver and the passenger as to the length of their trip; 9) the absence of the registered owner of the pickup; 10) the observation of three cell phones in the pickup when Trooper Henrichs approached the pickup; and 11) when asked about the discrepancies, the driver stated the passenger was probably scared because he was illegal. Given the totality of the circumstances and Trooper Henrichs' experience, he was more than justified in detaining the pickup for a K-9 sniff. The K-9 was called for promptly and the arrival of the K-9 was not unreasonably prolonged in view of the circumstances, the location, and the time of day. ***United States v. Connelly***, 475 F.3d 946, 953-54 (8th Cir. 2007); ***United States v. Bloomfield***, 40 F.3d 910, 917(8th Cir. 1994). I find the detention and the delay waiting for the K-9 was justified under the Fourth Amendment.

### C. Search of the Pickup
#### 1. Standing

To claim Fourth Amendment protection, a defendant must demonstrate that he or she personally has an expectation of privacy in the place searched, and that such expectation is reasonable. ***Minnesota v. Carter***, 525 U.S. 83, 88 (1998); ***United States v. Ruiz-Zarate***, 678 F.3d 683, 689 (8th Cir. 2012). The reasonableness of the expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." ***Rakas v. Illinois***, 439 U.S. 128, 143-44 n.12 (1978); **see also *Smith v. Maryland***, 442 U.S. 735, 740-41 (1979). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing

to claim that they were searched or seized illegally." ***United States v. Barragan***, 379 F.3d 524, 529-30 (8th Cir. 2004).

In this case, Hamolequet was a mere passenger in the pickup. She was not the owner and had no legitimate expectation of privacy in the vehicle or its contents. ***United States v. Crispen***, 627 F.3d 1056, 1063 (8th Cir. 2010). During the hearing, Hamolequet Quiroga was given the opportunity to present evidence concerning her standing and argue it in her post-hearing brief even after being put on notice by the government's opening brief (Filing No. 35 - Brief p. 24-27). The court finds Hamolequet Quiroga does not have standing to object to the search of the Ford pickup.

### 2. The K-9 Sniff

The canine sniff of the vehicle by itself does not constitute a "search" within the meaning of the Fourth Amendment. "A dog sniff is not a search within the meaning of the Fourth Amendment, and thus requires no probable cause to be performed." ***United States v. Sanchez***, 417 F.3d 971, 976 (8th Cir. 2005) (**citing** ***Illinois v. Caballes***, 543 U.S. 405 (2005)); **see also** ***United States v. Grant***, 696 F.3d 780, 784 (8th Cir. 2012). This is because "a canine sniff of the exterior of personal property in a public location 'is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.'" ***$404,905.00 in U.S. Currency***, 182 F.3d 643, 647-49 (8th Cir. 1999) (**quoting** ***United States v. Place***, 462 U.S. 696, 707 (1983) (luggage at an airport)). Furthermore, the principle also applies to the canine sniff of the exterior of a vehicle because "[t]he exterior of a car . . . is thrust into the public eye, and thus to examine it does not constitute a 'search.'" ***Id.*** (**quoting** ***New York v. Class***, 475 U.S. 106, 114 (1986)); **see also** ***Grant***, 696 F.3d at 784. "[A] law enforcement officer need not obtain consent to conduct a dog sniff during an otherwise lawful encounter, just as an officer does not need any justifiable suspicion under the Fourth Amendment to legally conduct [a] dog sniff." ***Grant***, 696 F.3d at 784 (internal quotation omitted) (second alteration in original). A police service canine's alert to the odor of drugs in a vehicle provides probable cause that drugs are present. ***United States v. Mendoza***, 677 F.3d 822, 828 (8th Cir. 2012). After probable cause is established, a vehicle may be searched without a warrant under the

automobile exception to the warrant requirement. *Id.*; **United States v. Claude X**, 648 F.3d 599, 602 (8th Cir. 2011). Thus with a K-9 indication on the pickup, law enforcement permissibly searched the pickup under the Fourth Amendment, and anything found would not be inadmissible in evidence based on the circumstances surrounding the search.

**IT IS RECOMMENDED TO SENIOR JUDGE JOSEPH F. BATAILLON** that:

1. Josue Quiroga's Motion to Suppress Evidence (Filing No. 27) be denied.
2. Hamolequet Adi Quiroga's Motion to Suppress (Filing No. 25) be denied.

**ADMONITION**

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 30th day of December, 2015.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge